| | | |
|---|---|---|
| ADBAR COMPANY, L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06-CV-1689 (JCH) |
| | ) | |
| PCAA MISSOURI, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

The matter is before the Court on Defendant's Motion for Summary Judgment, filed October 31, 2007. (Doc. No. 27). The matter is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Adbar Company is a Missouri limited liability company that engages in real estate development. (Pet., Doc. No. 1 at ¶ 1; Def.'s Memo. in Supp. of its Sum. J. Mot. ("Memo. in Supp."), Doc. No. 28 at Ex. A p. 20). Defendant is a Delaware limited liability company with its principal place of business in California. (Pet. at ¶ 2). Defendant and its parent corporation Parking Company of American Airports operate parking lots throughout the United States. (Resp., Doc. No. 30 at Ex. C-1 pp. 6-7).

In 2000, Plaintiff purchased a 3.2 acre plot of land near Lambert-St. Louis International Airport ("Airport") in Woodson Terrace, Missouri. (Memo. in Supp. at Ex. A pp. 10-14). Plaintiff demolished the existing structure and built a parking lot ("Lot"), with the intention that it would be used as an airport parking and shuttle facility. (Id. at pp. 13-14). Plaintiff contracted with S & H Parking, a local parking lot company, to run the Lot. (Id. at pp.14-15). In August 2001, the Lot

opened using the name "BudJet." (Id. at p. 16). S & H Parking operated the Lot for one year. (Def.'s

Statement of Uncontroverted Facts ("Def.'s Facts"), Doc. No. 28-2 at ¶¶ 42-43). Plaintiff then

operated it for six months. (Id. at ¶¶ 44). Plaintiff then contracted with St. Louis Parking, another

local parking lot company, to run it. (Id. at ¶¶ 45-46). St. Louis Parking operated the Lot until

October 2004. (Id.). Each of these three companies failed to earn a profit while operating the Lot.

(Id. at ¶¶ 47-49). Between 2001 and 2004, each of these companies operated the Lot under the name

"BudJet." (Memo. in Supp. at Ex. A pp. 29-32). The name "BudJet," however, has never been

trademarked. (Def.'s Facts at ¶ 17).

In 2004, Plaintiff wanted to sell the Lot because of its poor performance. (Pl.'s Statement of

Disputed Material Facts ("Pl.'s Facts"), Doc. No. 30-2 at ¶ 12). Originally, Defendant wanted to

purchase the Lot so it could enter the St. Louis market by acquiring an "existing presence." (Id. at

¶¶ 6-7). Defendant believed that it could "enhance the business by stimulating a greater level of

activity from historical levels." (Id. at ¶ 14). Defendant intended to purchase the Lot by assuming the

Plaintiff's outstanding debt, which was approximately $2,200,000,[1] but the bank refused to allow the

assignment.[2] (Resp. at Ex. C-1 pp. 17-18). Defendant then decided to lease the Lot from Plaintiff and

to have a purchase option included in the lease. (Id. at pp. 19-20).

On October 21, 2004, the parties executed a lease for the Lot that lasted until October 31,

2006. (Memo. in Supp. at Ex. B p. 1). The lease stated that Plaintiff "hereby leases the Premises to

Tenant and Tenant hereby rents from (sic) the Premises from Landlord, for the term and subject to

---

[1]This price was lower than the $2,775,000 appraised value in September 2004. (Resp. at Ex.
C-2 pp. 5-6). The appraisal value included both the "business and owned land." (Id. at p. 6).

[2]Defendant contends that this fact is hearsay. The Court will consider this fact because it is
not being offered to prove that the bank actually refused to allow the assignment. Rather, it is being
offered to show why the parties believed that the sale could not go through.

the conditions of this Lease." (Id. at § 1.01). The lease defines "the Premises" as "[t]he land, building and improvements located at" the Lot. (Id. at p. 1). At the time of the lease's execution, the Lot was enclosed by a chain link fence and improved with mechanical gates and an attendant booth. (Pl.'s Facts at ¶ 20). During the first year, the base rent was $102,000, paid in monthly installments of $8,500. (Id.). In the second year, the base rent increased to $ 144,000, paid in monthly installments of $12,000. (Id.). The lease also contained a $2,300,000 purchase option for year one and a $2,450,000 purchase option for year two. (Id. at § 30.02). The lease required Defendant to pay all of the taxes, assessments, and utilities for the Lot. (Id. at ¶¶ 5.01-.02).

The lease stated that "the Premises during the continuance of this Lease will be used and occupied for the purposes set forth in the Summary." (Id. at § 6.01). The only permissible use listed in the Summary was the "[o]peration of an off-airport parking facility business and related uses." (Id. at p. 1). The lease required that "[a]t the expiration (or earlier termination) of the Term, Tenant will surrender the Premises in as good condition and repair as they were at the time Tenant took possession, reasonable wear and tear excepted . . . ." (Id. at § 18.01). Finally, the lease had a merger clause, which stated:

> This Lease and the Exhibits attached hereto and forming part hereof, set forth all the covenants, agreements, stipulations, promises, conditions and understandings between Landlord and Tenant concerning the Premises and there are no covenants, agreements, stipulations, promises, conditions or understanding, either oral or written, between them other than herein set forth.

(Id. at § 31.01). Finally, the parties stipulated that Missouri law controls the construction and enforcement of the lease. (Id. at § 32.06). The lease did not address use of the name "BudJet."

Defendant began operating the Lot under the name "BudJet Avistar." (Def.'s Facts at ¶ 18). Defendant paid the base rent as required under the lease. (Id. at ¶ 15). Plaintiff's owner, Keith Barket, claims that Defendant did not satisfy all its obligations under the lease because it failed to pay the

2006 property taxes. (Memo. in Supp. at Ex. A p. 101). Sometime after entering into the lease, Defendant acquired another parking lot near the Airport and decided to focus its efforts at that lot. (Def.'s Facts at ¶ 20). On June 19, 2006, Defendant notified Plaintiff that it would neither exercise its purchase option nor renew the lease. (Memo. in Supp. at Ex. C). Defendant then placed a sign at the Lot stating: "We are MOVING to AVISTAR AIR PARK 4607 AIR FLIGHT DR (Behind the Marriot Hotel)." (Resp. at Ex. F). Defendant also handed out coupons, with the logo "AviStar BudJet" on them, reading: "WE ARE MOVING! Last Day June 30th! Try Our New Location! as we join with AviStar Airpark Airport Parking 4607 Airflight Drive, St. Louis, MO 63134." (Id. at Ex. C-3 pp. 16-17). Although Defendant continued to pay rent until October 2006, the Lot was not used after June 30, 2006.

Once the lease ended, Barket testified that he could not find anyone to operate an airport parking facility at the Lot. (Resp. at Ex. B p. 92). Barket also testified that Plaintiff had been damaged in two ways. First, it has been forced to pay the full cost of servicing the mortgage on the Lot, which is approximately $14,000 a month. (Id. at p. 76). Secondly, he claims that Defendant's actions devalued the Lot. Specifically, Plaintiff hired an appraiser that valued the Lot at $1,500,000 with an operating parking lot and at $1,000,000 without one. (Memo in Supp. at Ex. G pp. 26-27).

On October 13, 2006, Plaintiff filed this action in the Circuit Court of St. Louis County, Missouri. (Notice of Removal, Doc. No. 1 at ¶ 1). On November 20, 2006, Defendant removed this action to this Court on the basis of diversity jurisdiction. (Id.). The Petition alleges the following counts: (I) Breach of Lease; (II) Breach of Implied Covenant of Good Faith and Fair Dealing; (III) Tortious Interference with Business Expectancy; (IV) Unjust Enrichment; and (V) Unfair Competition. (Memo. in Supp. at Ex. D). Plaintiff voluntarily dismissed Count IV without prejudice. (Notice of Voluntary Dismissal, Doc. No. 32). As previously stated, Defendant filed its motion for

summary judgment on October 31, 2007. (Mot. for Sum. J., Doc. No. 28). In this motion, Defendant asserts that all of Plaintiff's claims fail. (Id.).

<h2 style="text-align:center">SUMMARY JUDGMENT STANDARD</h2>

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

As a federal court sitting in diversity, this Court will apply the laws of the State of Missouri. Altru Health Sys. v. Am. Prot. Ins. Co., 238 F.3d 961, 962 (8th Cir. 2001). The Court looks first to

decisions of the Missouri Supreme Court.  Blum v. Allstate Ins. Co., 296 F. Supp.2d 1037, 1039 (E.D. Mo. 2003).  If no relevant decisions are available, the Court  will look to Missouri appellate court decisions.  Id.  The task is "to determine how the Missouri Supreme Court would decide the issue at hand."  Id.

## DISCUSSION

### I.    Count I: Breach of Lease

Plaintiff alleges that Defendant breached the lease by failing continuously to operate a parking facility at the Lot and by eroding the customer base. (Pet. at ¶ 14).  Plaintiff alleges that § 6.01 of the lease is a covenant enjoining non-use. (Id. at ¶ 14(a)). Similarly, it alleges that § 18.01 of the lease required Defendant to return the property and customer base in good condition. (Id. at  ¶ 14(b)). Plaintiff offers extrinsic evidence to support its allegations. Defendant asserts that the lease only restricted the use of the Lot and did not require the continuous operation of a parking facility. (Memo. in Supp. at p. 4). Additionally, Defendant asserts that § 18.01 only required it to return the Lot in good physical condition. Finally, Defendant asserts that there is no implied covenant requiring continuous operation or preservation of the customer base.

The interpretation of a contract, including whether it is ambiguous, is a question of law. Helterbrand v. Five Star Mobile Home Sales, Inc., 48 S.W.3d 649, 658 (Mo. Ct. App. 2001). The cardinal principle of contract construction is "to ascertain the intention of the parties and to give effect to that intent." Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995). In interpreting a contract, the Court uses "the plain, ordinary, and usual meaning of the contract's words" and considers the "whole document." Jackson County v. McClain Enters., 190 S.W.3d 633, 640 (Mo. Ct. App. 2006). If a contract is unambiguous, the "intent of the parties will be gathered

solely from the terms of the contract." <u>State ex rel. Vincent v. Schneider</u>, 194 S.W.3d 853, 860 (Mo. 2006).

The parole evidence rule states that "where a written contract is unambiguous and complete on its face, parol evidence may not be introduced to vary or contradict the terms of the agreement." <u>Devino v. Stark</u>, 132 S.W.3d 307, 311-12 (Mo. Ct. App. 2004). The existence of a merger clause is a strong indication on the face of the contract that the writing is intended to be complete. <u>Carlson v. Tandy Computer Leasing</u>, 803 F.2d 391, 395 (8th Cir. 1986) (applying Missouri law). The parole evidence rule is a rule of law, not merely a rule of evidence. <u>Bracht v. Grushewsky</u>, 448 F. Supp. 2d 1103, 1109 (E.D. Mo. 2006). Here, the lease contained a merger clause, meaning the Court cannot consider any extrinsic evidence unless it determines that the agreement is ambiguous. <u>See</u> <u>Royal Banks of Mo. v. Fridkin</u>, 819 S.W.2d 359, 361 (Mo. 1991).

There are two types of ambiguity, patent and latent.[3] A patent ambiguity is an ambiguity that appears on the face of the contract. <u>See</u> <u>Emerald Pointe, L.L.C. v. Jonak</u>, 202 S.W.3d 652, 659 (Mo. Ct. App. 2006). The test for determining whether an patent ambiguity exists is "whether the disputed language, in the context of the entire agreement, is reasonably susceptible of more than one construction giving the words their plain meaning as understood by a reasonable average person." <u>Stark v. Sandberg, Phoenix & von Gontard, P.C.</u>, 381 F.3d 793, 801 (8th Cir. 2004). A contract is

---

[3]A latent ambiguity arises when where a writing is clear and unambiguous on its face, but the meaning is made uncertain due to collateral matters. <u>Jonak</u>, 202 S.W.3d at 659. Latent ambiguities arise where a contract cannot be executed due to the ambiguity. <u>See</u> <u>Smith v. Taylor-Morley, Inc.</u>, 929 S.W.2d 918 (Mo. Ct. App. 1996). For example, the Missouri Supreme Court found a latent ambiguity in a contract that described a $100,000 promissory note dated October 29, 1984 when only a promissory note dated October 29, 1984 for $50,000 existed. <u>Fridkin</u>, 819 S.W.2d at 362. Since latent ambiguities are not apparent on the face of the document, extrinsic evidence is admissible to show the real intent of the parties. <u>Id.</u> After examining the extrinsic evidence, the Court finds that no latent ambiguity exists because none of the evidence suggests that the lease could not be executed due to some collateral matter.

not ambiguous just because the parties disagree about its meaning. J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973). Extrinsic or parol evidence cannot be used to create an ambiguity that does not otherwise exist. Helterbrand, 48 S.W.3d at 658 (citing Harris v. Union Elec. Co., 622 S.W.2d 329, 246-47 (Mo. Ct. App. 1981)).

### A.     Section 18.01

Section 18.01 required Defendant to "surrender the Premises in as good condition and repair as they were at the time Tenant took possession, reasonable wear and tear expected." (Memo. in Supp. at Ex. B § 18.01). Defendant asserts that this provision only relates to the actual, physical property. Plaintiff does not address this argument other than stating, in a footnote, that Plaintiff construed the term as requiring the return of an operating parking facility business.

The Court has not been able to locate any case law that supports Plaintiff's theory that § 18.01 required Defendant to return a viable business, or customer base. See G. Van Ingen, Annotation, Extent of Lessee's Obligation under Express Covenant as to Repairs, 20 A.L.R. 2d 1331 (supp. 2007). The phrase "in as good condition and repair" is a description of how the Premises must be returned to Plaintiff. The word "Premises," as defined in the summary, is the "the land, building, and improvements" on the Lot. "Land "is unambiguous as it refers to the actual soil and earth underneath the Lot. "Building" is also unambiguous as it refers to any buildings or habitable structures on the Lot.  "Improvement" is unambiguous as it refers to any permanent structures or developments, such as fences, mechanical gates, pavement, and utilities, located on the Lot.  See Black's Law Dictionary 787 (6th ed. 1990) (defining improvement as generally referring to "buildings, but may also include any permanent structure or development, such as a street, sidewalk, sewers, utilities, etc."). Accordingly, a plain reading of § 18.01 shows it only required Defendant to return the property in a similar physical condition to how it was in October 2004.

**B.     Section 6.01**

Section 6.01 states, in pertinent part, that "the Premises during the continuance of this Lease will be used and occupied for the purposes set forth in the Summary." (Memo. in Supp. at Ex. B § 6.01). The Summary states that the only permissible use is "operation of an off-airport parking facility business and related uses." (Id. at p. 1). Plaintiff alleges that § 6.01 required Defendant to operate a parking facility on the Lot throughout the entire lease term. Defendant counters that § 6.01 only restricted the type of businesses that could operate on the Lot.

Upon consideration, the Court finds that the lease did not expressly require Defendant to continuously operate a business at the Lot. First, the plain language of § 6.01 does not support Plaintiff's interpretation. The words "used and occupied, " given their ordinary meaning, merely restrict the type of activities that Defendant could undertake on the Lot. Both of these words express how the Lot may be used, not when it has to be used.[4] Additionally, the Court doubts that the parties agreed to a continuous use provision because sophisticated business entities, such as the parties, would likely include more precise terms to govern such an important covenant. See Sampson Invs. by Sampson v. Jondex Corp., 499 N.W.2d 177, 181-83 (Wis. 1993) (holding clause stating "premises shall be used and occupied" did not require continuous use because, among other things, the lease did not contain provisions that would ordinarily be included with a covenant of continuous use). For example, the Court would expect a lease containing a continuous use requirement to address when a tenant may stop operations, the assignability of the lease, and the required hours of operation.

_____

[4]Even if the Court were uncertain about the meaning of these words, the result would not change because "when there is any doubt or uncertainty to the meaning of a lease, the lease should be construed most strongly against the lessor." Stella v. DePaul Cmty. Health Ctr., Inc., 642 F.2d 258, 260 (8th Cir. 1981) (applying Missouri law).

The Court's inability to find any Missouri case law supporting Plaintiff's interpretation of § 6.01 also supports its interpretation of the lease. See John A. Glenn, Lease of Store as Requiring Active Operation, 40 A.L.R. 3d 971 (1971) (generally a tenant is not required to operate a business absent an express provision in a lease); see also Benson v. Sauris, 204 S.W. 550, 551 (Mo. Ct. App. 1918) (noting that a provision which restricts use is not the same as a provision that enjoins non-use). Moreover, continuous use clauses usually contain something more than the words "use" and "occupy." See Giessow Rests., Inc. v. Richmond Rests., Inc., 232 S.W.3d 576, 580 (Mo. Ct. App. 2007) (holding language"for no other purpose or business than that" of a restaurant did not require tenant to continuously operate a restaurant); cf. MRI Northwest Rental Invs., I, Inc. v. Schnucks-Twenty-Five, Inc., 763 S.W.2d 375, 376-77 (Mo. Ct. App. 1989) (holding language "tenant will continuously conduct and operate," required tenant to continuously operate a business); cf. also J.J. Newberry Co. v. Mixon, 440 F. Supp. 20, 21 (E.D. Mo. 1977) (noting that provision requiring tenant to "keep the entire demised premises open for business during business hours" was a continuous use provision). Finally, Courts generally hold that a lease clause stating the tenant "will use the premises for___" is "deemed to permit the use specified but not to require it." Milton R. Friedman & Patrick A. Randolph, Jr., Freidman on Leases § 6:9.4 (Supp. 2006).

Plaintiff also asserts that the lease contained an implied covenant of continuous use. Missouri courts hold that "implied obligations must rest entirely upon the presumed intentions of the parties, as gathered from the terms actually expressed in the lease itself." Halls Ferry Invs., Inc. v. Smith, 985 S.W.2d 848, 853 (Mo. Ct. App. 1998). Courts will not imply a covenant "in order to make an agreement fair and reasonable." Birdsong v. Bydalek, 953 S.W.2d. 103, 118 (Mo. Ct. App. 1998). Missouri courts also consistently refuse to find implied covenants in clearly drafted leases. See Giessow Rests., 232 S.W.3d at 580.

Generally, courts will only imply a covenant of continuous use in three situations. First, they will imply one when a business functions as the anchor store of a shopping mall due to the economic interdependencies that an anchor store creates. See Ingannamorte v. Kings Supermarkets, Inc., 260 A.2d 841, 844-45 (N.J. 1970). Secondly, courts will imply one when the lease contains a very small fixed rent accompanied by an additional rental based on the store's sales. First Am. Bank & Trust Co. v. Safeway Stores, Inc., 729 P.2d 938, 940-41 (Az. Ct. App. 1985). Missouri courts, however, will not find an implied covenant of continuous use based on the "mere fact that a rental provision of a lease was based on a combination of a fixed rent and a percentage rent." Giessow Rests., 232 S.W.2d at 580. Courts also imply a covenant of continuous use when the failure continuously to use a property results in the loss of a non-conforming zoning use allowed under a grandfather clause. See TOC Retail, Inc. v. Gulf Coast Oil Co., 886 F. Supp. 1306, 1313 (E.D. La. 1995). Finally, some courts look at whether the lease allowed free assignment of the lease and whether it contained a non-compete clause. Frederick Bus. Props. Co. v. Peoples Drug Stores, Inc., 445 S.E.2d 176, 180 (W. Va. 1994).

Upon consideration, the Court finds that the lease does not contain a covenant of continuous use. First, the Court has already found that the lease is clearly drafted, meaning Missouri courts would likely refuse to find an implied covenant. Secondly, none of the circumstances normally present when a continuous use covenant is implied are present. The Lot is not an anchor business. The lease contains a substantial minimum rent and requires no percentage rent. The lease is not assignable, meaning the parties likely did not agree to a continuous use covenant because free assignability suggests that the landlord sacrificed having a certain tenant in exchange for an assurance of a constantly operating business. Finally, Defendant is not in danger of losing a non-conforming use that

was grandfathered in under the zoning laws. As such, the Court finds that the lease does not contain a continuous use provision and will grant Defendant summary judgment on Count I.

## II.    Count II: Breach of the Covenant of Fair Dealing and Good Faith

Plaintiff alleges that Defendant breached the covenant of fair dealing and good faith that applies to every contract by failing to run a airport parking facility, using its position as tenant to steal customers, and passing off its new location as a continuation of BudJet. (Pet. at ¶ 18).

Missouri implies in every contract a covenant of good faith and fair dealing that requires the performance and enforcement of the terms be carried out in good faith. Finova Cap. Corp. v. Ream, 230 S.W.3d 35, 45 (Mo. Ct. App. 2007). This obligation requires that the parties neither prevent nor hinder performance by the other party. Schell v. LifeMark Hosps. of Mo., 92 S.W.3d 222, 230 (Mo. Ct. App. 2002). The covenant encompasses "an obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." Spencer Reed Group, Inc. v. Pickett, 163 S.W.3d 570, 574 (Mo. Ct. App. 2005). It also requires one party to cooperate with another to enable performance and achievement of the expected benefits. Slone v. Purina Mills, Inc., 927 S.W.2d 358, 368 (Mo. Ct. App. 1996).

This implied covenant, however, is not a general reasonableness requirement. Schell, 92 S.W.3d at 230. Nor is it "an overflowing cornucopia of wished-for legal duties." Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir.1996). Though phrased in moralistic overtones, good faith does not import into contract law the negligence principles of tort law. See Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d 34, 47-48 (Mo. Ct. App. 2002). Additionally, the covenant cannot "give rise to new obligations not otherwise contained in a contract's express terms." RehabCare Corp., 98 F.3d at 1066 (8th Cir.1996) (citing Glass v. Mancuso, 444

S.W.2d 467-68 (Mo.1969)). The party claiming breach of the implied covenant of good faith must

present substantial evidence that it has been violated. Pickett,163 S.W.3d at 574.

Upon consideration, the Court finds that Plaintiff's claim fails because it is an attempt to

extend the contract beyond its express terms. Stated differently, the Court views this claim as

Plaintiff's attempt to assert a claim for breach of implied contract provisions. Such a strategy,

however, is not allowed under Missouri law. Birdsong, 953 S.W.2d at 120. As the Court previously

held, the lease does not contain a covenant of continuous use, meaning that the Court cannot imply

a duty to continuously operate the Lot in good faith. The Court believes that there is no good faith

duty regarding the maintenance of a customer base because the lease's express terms make no

mention of it. It would be incongruous to hold that the lease contained no implied or express

covenant of continuous operation, but to find that the good faith covenant required Defendant to

continuously operate the Lot.

At most, the covenant of good faith and fair dealing required a good faith attempt by plaintiff

to run a successful airport parking facility on the Lot so that it would exercise the purchase option.

Here, Defendant did operate a parking facility on the Lot for twenty out of the twenty-four months.

Defendant then determined that its operation was not viable and moved to a more economically viable

location. This decision did not deprive Plaintiff of the benefit of its bargain. Cf. Rocky Ridge Ranch

Prop. Owners Ass'n v. Areaco Inv. Co., 993 S.W.2d 553, 556 (Mo. Ct. App. 1999) (holding that

attempt to manipulate the voting scheme in a residential owner's association breached duty of fair

dealing because it was an attempt to circumvent the entire agreement). It still received all of its base

rent payments. Cf. Magruder Quarry & Co. v. Briscoe, 83 S.W.3d 647, 652 (Mo. Ct. App. 2002)

(holding that there is an implied covenant to mine rocks where rent is solely based on the amount of

ore mined). Although Plaintiff wishes that the option was exercised, contracting for the option was merely a gamble that did not pay off. See RehabCare Corp., 98 F.3d at 1063.

## III.     Economic Loss Doctrine

In Count III, Plaintiff alleges that Defendant tortiously interfered with Plaintiff's business expectancy in the continued viability of BudJet by luring away current and future customers. (Resp. at p. 11). In Count V, Plaintiff alleges that Defendant's behavior amounts to unfair competition. (Id. at p. 12).  Defendant asserts that, because both of these claims only seek economic losses, they are barred by the economic loss doctrine. (Memo. in Supp. at p. 21).

The economic loss doctrine prohibits a cause of action in tort "where the losses are purely economic." Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 198 (8th Cir. 1995) (discussing Missouri law). The Missouri Supreme Court explains that recovery in tort is limited to cases in which there has been "personal injury, or property damage either to property other than the property sold, or to the property sold when it was rendered useless by some violent occurrence." Crowder v. Vandendeale, 564 S.W.2d 879, 881 (Mo. 1978). This doctrine is usually limited to the area of products liability. Self v Equilon Enters., LLC, No. 4:00CV1903TA, 2005 WL 3763533, at * 8 (Mo. E.D. March 30, 2005).

The Missouri state courts have never addressed whether the economic loss doctrine can bar a claim for unfair competition or tortious inference. The Ninth Circuit has explained, however, that the economic loss doctrine does not bar all claims for economic loss because tort law "has traditionally protected individuals from a host of wrongs that cause only monetary damages." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 875 (9th Cir. 2007) (collecting case law to support this conclusion); Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 398 (7th Cir. 2003) (applying Illinois law) (holding economic loss doctrine "does not apply to actions for intentional

interference with contract or intentional interference with prospective business advantage."). The Ninth Circuit recognized that some courts have extended the economic loss doctrine beyond its typical boundaries when the tort alleged "amounted to nothing more than a failure to perform a promise contained in a contract." Giles, 494 F.3d at 876. This conclusion is in harmony with a decision from the Eastern District of Missouri holding that the economic loss doctrine bars a tortious interference claim when such a claim "arises out of the parties['] contractual relationship." Self, 2005 WL 3763533, at *11; see Monroe Prop., LLC v. Bachelor Gulch Resort, LLC, 374 F. Supp. 2d 914, 923 (D. Colo. 2005) (applying Colorado law) (holding economic loss doctrine barred tortious inference claim where alleged interference was governed by contract between the parties); Law Offices of David J. Stern, P.A. v. SCOR Reins. Corp., 354 F. Supp. 2d 1338, 1346 (S.D. Fla. 2005) (noting that the Florida Supreme Court held that "where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract."); Plourde Sand & Gravel v. JGI E., Inc., 917 A.2d 1250, 1254 (N.H. 2007) (holding that "where a duty lies outside the terms of the contract is owed, many states allow a plaintiff to recover economic loss in tort against the defendant contracting party."); Brew City Redev. Group, LLC v. Ferchill Group, 724 N.W.2d 879, 886 (Wis. 2006) (holding that economic loss doctrine did not apply to a malicious injury to business and reputation claim because the claims were not dependent on contract and contained different allegations than breach of contract claim);

Upon consideration, the Court finds that Counts III and V are not barred by the economic loss doctrine. The Court has already held that the lease neither includes a covenant to operate the Lot continuously nor a covenant to return the Lot with an operating business. By implication, the lease contained no duty to return the Lot with a functioning airport parking business. Plaintiff's allegations in Count III and Count V center on Defendant's supposed breach of a duty to return a functioning

- 15 -

airport parking business. As such, Plaintiff's claims are dependent on duties that only exist outside of the lease's express and implied terms.

## IV:     Count III: Tortious Interference

Count III alleges that Defendant tortiously interfered with the relationship between Plaintiff and BudJet's existing and potential customers. Defendant asserts that this claim fails because Plaintiff had no business expectancy and cannot show an absence of justification.

To succeed on a tortious interference claim in Missouri, Plaintiff must prove: "(1) the existence of a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) the absence of justification; and (5) damages." Tamko Roofing Prods., Inc. v. Smith Eng'g Co., 450 F.3d 822, 829 (8th Cir. 2006) (quoting McGuire v. Tarmac Envtl. Co., 293 F.3d 437, 441 (8th Cir. 2002)). Moreover, liability for tortious interference "cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." Id. at 830 (quoting Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n, 670 S.W.2d 895, 905 (Mo. Ct. App. 1984)).

A business expectancy need not be based on an existing contract. BMK Corp. v. Clayton Corp., 226 S.W.3d 179, 190 (Mo. Ct. App. 2007). Missouri courts holds that " a probable future business relationship that gives rise to a reasonable expectancy of financial benefit is enough." Stehno v. Sprint Spectrum, L.P., 186 S.W.3d 247, 251 (Mo. 2006). A business expectancy must be more than a "mere hope," Id. at 250, and not be too "remote or indefinite." Weicht v. Suburban Newspapers of Greater St. Louis, Inc., 32 S.W.3d 592, 598 (Mo. Ct. App. 2000). A regular course of similar prior dealings can suggest a valid business expectancy. Slone, 927 S.W.2d at 37 (citing Am. Bus. Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1143 (8th Cir. 1986)).

Upon consideration, the Court finds that a genuine issue of material fact prevents it from determining whether a reasonable business expectancy of a parking lot being operated throughout the lease term existed. It is clear that Plaintiff had some expectancy that the Lot would be returned with an operating business. The genuine issue of fact is whether this expectancy was reasonable. Defendant cites deposition testimony stating that Plaintiff "is not in the parking lot business." (Memo. in Supp. at p. 14). Plaintiff counters that it has operated the Lot as a third party manager since it bought the Lot in 2001 and also operated the Lot itself for six months. (Def.'s Facts at ¶¶ 41-46). Missouri courts hold that disputes over the reasonableness of a business expectancy are best left to a jury. Londoff v. Walnut Street Secs., Inc., 209 S.W.3d 3, 10 (Mo. Ct. App. 2006).

Justification exists for interfering with another's business expectancy "when one undertakes to protect a valid economic interest." Gott, 963 S.W.2d at 438. Competitive conduct is justified, as is interference taken to avoid a "substantial loss." Id. at 438-39. Plaintiff has the burden of producing substantial evidence to establish an absence of justification. Cordry v. Vanderbilt Mortgage & Fin., 370 F. Supp. 2d 923, 933 (W.D. Mo. 2005). An absence of justification is "the absence of any legal right on the part of defendant to take the action about which a plaintiff complains." Id. (quoting Chandler v. Allen, 108 S.W.3d 756, 760 (Mo. Ct. App. 2003)). Conduct lacks justification when a defendant employs "improper means" to "further the defendant's interests to the detriment of the plaintiff." Ozark Employment Specialists, Inc. v. Beeman, 80 S.W.3d 882, 896 Mo. Ct. App. 2002). Improper means are acts that are "independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." Nazeri v. Mo. Valley Coll., 860 S.W.2d 303, 317 (Mo. 1993). No liability arises, however, from interfering with a business expectancy if the defendant had an unqualified legal

right to do the action about which plaintiff complains. <u>Vikings, USA Bootheel MO v. Modern Day Veterans</u>, 33 S.W.3d 709, 711 (Mo. Ct. App. 2000).

As an initial matter, the Court finds that the act of closing the Lot cannot constitute tortious interference because Defendant did so to stop a substantial loss. Neither party disputes that the Lot never made a profit. The mere act of closing an unprofitable business is justified. Thus, the Court will focus on whether Defendant's action in directing customers to another location lacked justification.[5] For this action to lack justification, Defendant must have employed improper means. As previously stated, improper means are actions that violate Missouri statutory law or common law. Plaintiff has not identified what law Defendant's actions violated. The only violation of Missouri statute or common law that it has identified is the tort of unfair competition. As such, the Court will grant summary judgment on Count III unless Plaintiff's unfair competition claim survives summary judgment.

## V.    Count V: Unfair Competition

Defendant asserts that Plaintiff's unfair competition claim fails because it did not "pass off" Plaintiff's product as its own. Defendant also asserts that because Plaintiff is not in the parking lot business, it has no product that can be passed off. (Memo. in Supp. at p. 20).Finally, it contends that Plaintiff abandoned its trade name by allowing others to use it. (<u>Id.</u>). Plaintiff responds that unfair competition encompasses more than "passing off" and that its unfair competition claim can go forward because it has presented evidence showing that Defendant's actions were fundamentally unfair.

The tort of unfair competition is amorphic in nature. One Missouri court explained that:

---

[5]Plaintiff offers substantial evidence that Defendant directed customers away from the Lot and to a new parking facility owned by it. (Resp. at p. 11).

> Unfair competition is a species of commercial hitch-hiking which the law finds offensive, and, therefore, prohibits. The law of unfair competition is but a reaffirmation of the rule of fair play. It aims to effect honesty among competitors by outlawing all attempts to trade on another's reputation-it gives the crop to the sower and not to the trespasser. In so doing it strives to protect the buying public from deception. . .
>
> A treatise on the subject contained an appropriate observation.
>
> "Unfair competition is not an objective 'thing' and has no objective reality. It is merely an intellectual concept convenient to describe a process which goes on in courts of law. It is as specious to attempt a sweeping, all-inclusive definition of 'unfair competition' as to try to define the legal term 'reasonable.' The term 'unfair competition,' as used to describe a generic class of commercial activities, is too abstract and subjective when divorced from concrete examples. One reason why the author has not attempted an over-all, sweeping definition is that the meaning of the term is fluid, having been refined on a case-by-case basis by lawyers and judges."

Cushman v. Mutton Hollow Land Dev., 782 S.W.2d 150, 157 (Mo. Ct. App. 1990) (internal citations omitted). Missouri courts may look to the Restatement (Third) of Unfair Competition when analyzing unfair competition claims. Doe v. TCI Cablevision, 110 S.W.3d 363, 368 (Mo. 2003).

Plaintiff's unfair competition claim resembles a claim for trademark infringement. The same facts which support a trademark infringement claim also support an unfair competition claim. Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc., 758 F. Supp. 512, 527 (E.D. Mo. 1991). Because Missouri does not have a "well developed body of trademark law," the Court may look to general trademark principles. Bass Busters, Inc. v. Gapen Mfg. Co., 420 F. Supp. 144, 156 (W.D. Mo. 1976). Missouri defines a trade name as a "word, name, symbol, device, or any combination thereof used by a person to identify his business ... and distinguish it from the business ... of others." Mo. Rev. Stat. § 417.005(7). A trade name, however, may be lost if its owner stops using the mark. See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022-23 (11th Cir. 1989); Gilbert/Robinson, Inc., 758 F. Supp. at 526 (holding that acquiescence can cause loss of mark).

Neither party seems to dispute that BudJet is a trade name. Moreover, neither party disputes that the business located at the Lot was known as "Budjet" prior to the beginning of the Lease.

As previously stated, Defendant contends that, because Plaintiff and Defendant are not "in competition," no claim of unfair competition can go forward. The Court disagrees because Missouri courts hold that to show trademark infringement, and by extension unfair competition, "it is no longer necessary that the parties be engaged in competitive business." Cushman, 782 S.W.2d at 161. Secondly, Defendant asserts that Plaintiff cannot assert an unfair competition claim because it abandoned its trade name by letting others operate the Lot for it. The Court does not believe that this assertion prevents Plaintiff's unfair competition action from going forward. Although Defendant is correct that such actions might prevent a trademark infringement claim from going forward, unfair competition is a broader tort that encompasses all business practices society deems "unfair." Restatement (3d) of Unfair Competition § 1, cmt. g. Plaintiff has put forward evidence that Defendant engaged in questionable business practices. Specifically, Plaintiff has presented evidence that Defendant actively directed customers away from the Lot and represented that the new lot was a continuation of BudJet. (Pl.'s Facts at ¶¶ 22-23). The Court concludes that a jury is in the best position to determine if Defendant's behavior violated society's notions of fair play and fundamental fairness. As such, the Court will not grant summary judgment on Count III or Count V.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 27) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Counts I and II of Plaintiff's Petition are **DISMISSED**.

Dated this 4th day of January, 2008.

_____
/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE